UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

JOSHUA G. HARRIS,

           Plaintiff,

     v.

TODD MCALISTOR, *et al.*,

           Defendants.

                         22-CV-75-LJV-JJM
                         DECISION & ORDER

───────────────────────────────

On January 25, 2022, the *pro se* plaintiff, Joshua G. Harris, commenced this action against the City of Buffalo; Erie County; several Buffalo, Erie County, and New York State government employees; and a private security company and three of its employees. Docket Item 2. A few months later, Harris filed an amended complaint.[1] Docket Item 3. Harris's amended complaint details a series of encounters with state and local law enforcement, government officials, and private security guards over four months during the spring and summer of 2019. *See id.*

As relevant here, Harris brings a number of constitutional claims related to two incidents that took place in government buildings during July 2019. Both incidents unfolded in similar ways: Harris entered a local government building while filming on his phone; he was asked to stop filming but refused to do so; and he then was forcibly removed from the building (first incident) or was arrested and charged with various criminal offenses (second incident).

───────────────

[1] On April 19, 2022, this Court granted Harris's motion to proceed *in forma pauperis* and screened the amended complaint under 28 U.S.C. § 1915(e)(2). Docket Item 4.

On June 1, 2022, defendants Erie County, Matthew Alabanese, Madonna Bishop, Ryan Roetzer, and Jason Wahl (the "Erie County defendants") moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6).  Docket Item 9.  A little less than four months later, defendants Alexander Costa, Dan Deneka, Rick Hewitt, John McEvoy, Robert Perry, James Schrier, Fred Schumacher,[2] and Dan Stark (the "New York State defendants") also moved to dismiss the amended complaint under Rule 12(b)(6).  Docket Item 26.  Harris responded to both motions, Docket Items 16 and 29, but neither the Erie County defendants nor the New York State defendants replied, and the time to do so has expired.  *See* Docket Items 11 and 27.

For the reasons stated below, the Erie County defendants' and the New York State defendants' motions to dismiss are granted in part and denied in part.  And within 45 days of the date of this order, Harris may amend his complaint to correct the deficiencies noted below.

## **FACTUAL BACKGROUND**[3]

## I.    **JULY 8 INCIDENT**

On July 8, 2019, Harris visited the Erie County office of the New York State Department of Motor Vehicles ("Erie County DMV") to get "assistance regarding the

---

[2] The New York State defendants spell Schumacher's name "Shumacher" in their papers.  *See, e.g.*, Docket Item 26 at 1.  The Court uses Harris's spelling in this decision.

[3] Unless otherwise noted, the following facts are taken from the amended complaint, Docket Item 3, and the charging instruments submitted by the defendants, Docket Item 26-2.  *See, e.g., Boykins v. Lopez*, 2022 WL 2307684, at *4 (S.D.N.Y. June 27, 2022) ("[C]ourts within the Second Circuit routinely take judicial notice of criminal complaints, indictments, and other charging instruments.").  On a motion to dismiss under Rule 12(b)(6), the court "accept[s] all factual allegations as true and draw[s] all

whereabouts of his record."  Docket Item 3 at ¶ 120.  "The clerk couldn't answer [Harris's] questions regarding the matter," so "she then went to get her supervisor," Bishop.  *Id.* at ¶ 121.  "Bishop stood off in[] the distance," so Harris "asked [her] to come closer so [that he] could hear her."[4]  *Id.* at ¶ 122.  But Bishop told Harris that if he was "going to record [her] then [they were] not going to talk" because Bishop did not "want to be on Facebook" and did not "want to be audited or filmed."  *Id.*  When Harris apparently refused to stop filming, Bishop "called the deputies to remove [him]" from the Erie County DMV.  *Id.* at ¶ 123.

Wahl and Roetzer, two officers in the Erie County Sheriff's Department, then "arrived on [the] scene and huddled with Bishop."  *Id.* at ¶¶ 10, 124.  "Moments later, [] Wahl informed [Harris] that the clerks were not going to take care of him."  *Id.* at ¶ 125.  When Harris protested that "he was still in need of service," Wahl again said that the clerks "are not going to help him" and told Harris "to 'just stand there.'"  *Id.*

Harris maintained that "he had questions for the clerks."  *Id.* at ¶ 126.  But "instead of getting the clerks[,] Roetzer proceeded [to] ask what questions [Harris] had

---

reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

The New York State defendants also have submitted a "copy of Facebook video footage of the [July 17] incident," which Harris apparently posted on Facebook.  *See* Docket Item 26-2.  They say that this video is subject to judicial notice because it is incorporated by reference in the amended complaint.  *See* Docket Item 26-1 at 2. Because Harris did not submit any video recordings or specifically cite any video in the relevant sections of his amended complaint, the Court refers only to Harris's amended complaint for the factual background of the July 17 incident.  In any event, the Court has reviewed the video recording submitted by the New York State defendants and it does not change the analysis below.

[4] Unless otherwise noted, all capitalization has been removed from citations to the amended complaint.

for the clerks." *Id.*  Harris "responded that it was none of [the officers'] business and that they . . . were dismissed." *Id.* at ¶ 127.  Wahl then "informed" Harris "that he ha[d] already seen [Harris's] past videos and that he was not going to go away." *Id.* at ¶ 128. And Wahl said that he "was going to escalate the incident" by calling Alabanese, another Erie County Sheriff's Department officer, "to the scene." *Id.*; *see id.* at ¶ 10.

Harris "asked [] Roetzer[] what law [] he broke." *Id.* at ¶ 129.  Roetzer "answered 'nothing at this point' or words to that effect." *Id.*  Harris then asked Roetzer if he "swore to uphold and defend the Constitution." *Id.* at ¶ 130.  After Roetzer replied "yes," Harris asked Roetzer and Wahl "what the issue was [with] him being there." *Id.*  At first, Roetzer said that "there [was] no issue"; he then said that "the issue is that [Harris is] standing here, filming when they didn't want [him] here." *Id.* at ¶ 131.

Harris asked to "speak to the supervisor." *Id.* at ¶ 132.  Roetzer told Harris that "the supervisor didn't want to speak to [him]" and that "the supervisor" in fact "told [Roetzer and Wahl] that [Harris]" must either "leave or be placed in [handcuffs]." *Id.*

Alabanese then "entered the scene" and "immediately asked [] Roetzer and Wahl if [Harris] had business" at the Erie County DMV. *Id.* at ¶ 133.  Harris "informed Alabanese that he did." *Id.*  But Wahl "informed Alabanese that the supervisor" told Wahl and Roetzer that Harris had to be removed or handcuffed. *Id.* at ¶ 134.

Alabanese then "gave [Harris] an ultimatum": "leave by force or be arrested." *Id.* at ¶ 135.  "Without a moment['s] notice," Alabanese "decided to go 'hands on' by grabbing [Harris] by the shirt and physically shoving [him] through the lobby area towards the doors." *Id.* at ¶ 136.  Wahl "assist[ed] Alabanese by opening the doors of the entrance while Roetzer complacently followed Alabanese as he shoved [Harris]

through the lobby[,] . . . through the doorway, out of the building, and [on to] the sidewalk." *Id.* at ¶ 137.

Alabanese told Harris "not to come back again" to the Erie County DMV. *Id.* at ¶ 138. Alabanese also "locked the entrance" to the Erie County DMV so that Harris could not reenter the building. *Id.* at ¶ 139. But Alabanese would "open[] the doors when other customers needed access" to the Erie County DMV. *Id.*

## II.   JULY 17 INCIDENT

About a week after that encounter at the Erie County DMV, Harris went to the "Erie County Building to file a compl[aint] against the deputies and clerk involved [in] the [July 8] incident."[5] *Id.* at ¶ 141. "[I]mmediately" after Harris "entered the lobby" of the building, Deneka, an officer in the New York State Office of Court Administration, told Harris "to stop recording." *Id.* Harris asked Deneka to "identify himself multiple times," but Deneka "refused to do so" and instead "called for backup." *Id.* at ¶ 142. Harris also "repeatedly asked Deneka to articulate the law that" barred Harris from filming, but Deneka "ignored [Harris] and [] continued to give the directive[] not to record in the public hallway." *Id.* at ¶ 143.

"Soon after, [Harris] was surrounded by [seven] officers." *Id.* at ¶ 144. Harris "had no idea who they were because all [of them] . . . refuse[d] to identify" themselves. *Id.*

---

[5] Harris may be referring to Erie County Hall in Buffalo, New York, although he refers to this building as the "Erie County Building" in his amended complaint. The Court therefore refers to the building as the "Erie County Building" in this decision.

Schrier, one of the officers on the scene, "requested [that Harris] put down [his] phone and stop recording in the building."  *Id.*  Harris and the officers then engaged in a "repeated back and forth."  *Id.* at ¶ 145.  Harris continued to ask for the officers' names and to request that they "articulate the law" that barred filming in the building.  *Id.*  In response, Schrier "repeat[ed] the policy of not recording in the area," and Perry "stated that [the officers] are enforcing policy and not actual law."  *Id.*  McEvoy, on the other hand, "stated that they were enforcing the law," but when Harris "asked [him] to articulate the law," McEvoy "fail[ed] to articulate an actual law."  *Id.* at ¶ 146.

Schrier then "informed [Harris] that he was now trespassing."  *Id.* at ¶ 147.  Harris "asked Schrier to articulate [his] reasoning."  *Id.*  Immediately "afterwards, McEvoy [] grabbed [Harris] without any warning."  *Id.* at ¶ 148.  Harris "was taken into custody" and was "shoved . . . into the elevator into lockup" by Deneka, Hewitt, Schumacher, Stark, Costa, Perry, McEvoy, and Schrier.  *Id.* at ¶ 149.

After he was taken into custody, Harris's phone "was taken away from him without a warrant" and he was "lock[ed] in[] a room in handcuffs for over an hour."  *Id.* at ¶ 150.  The handcuffs "were so tight that [Harris] lost [] circulation."  *Id.*  All the while, "the [] officers were laughing" at Harris "and ridiculing [him] while taking pictures of [him] on their tablet."  *Id.*

From there, Harris "was taken into the holding center of the Court Building for booking."  *Id.* at ¶ 151.  At that point, Buffalo police officers Hiba Khalil and Kayla Wise "proceeded to help [] McEvoy and Schrier[] book [Harris]."  *Id.*  During the booking, Harris "pleaded to . . . Khalil and Wise to help him."  *Id.* at ¶ 152.  But "instead of []

helping [him]," Khalil and Wise "mocked [Harris for the] videos" that he had "posted on his social media account in the past."  *Id.*

Harris was charged with trespassing, in violation of New York Penal Law § 140.05; disorderly conduct, in violation of New York Penal Law § 240.20; obstructing governmental administration, in violation of New York Penal Law § 195.05; and resisting arrest, in violation of New York Penal Law § 205.30.  *Id.* at ¶ 155; Docket Item 26-2 at 2-6.  At some point during the resulting criminal case, Harris "asked [where] the search warrant was" for his phone because the Buffalo police officers had received his phone more than a month earlier.  Docket Item 3 at ¶ 153.  The prosecutors "stated to the Court that [they were] working on" obtaining a warrant, and Khalil then "su[b]mitted a warrant application for the phone and the footage within the phone."  *Id.*  The judge presiding over Harris's case "granted that warrant application" despite a number of inadequacies.  *Id.* at ¶ 154.

Harris removed his criminal case to this Court in late 2019.  *See Harris v. McEvoy*, Case No. 19-cv-1595, Docket Item 1 (W.D.N.Y. Nov. 22, 2019); *see also* Docket Item 3 at ¶ 156.  This Court then remanded the case, *see Harris*, Case No. 19-cv-1595, Docket Item 11 (W.D.N.Y. July 9, 2020), and on August 18, 2021, all charges against Harris were dismissed, Docket Item 3 at ¶ 157.

## LEGAL PRINCIPLES

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "[A]lthough 'a court must accept as true all of the allegations contained in a complaint,' that tenet 'is inapplicable to legal conclusions,' and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alterations and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).

## DISCUSSION

### I.   THE ERIE COUNTY DEFENDANTS' MOTION TO DISMISS

Harris alleges that Erie County and the individual Erie County defendants violated his First and Fourth Amendment rights during the July 8 incident at the Erie County DMV. Docket Item 3 at ¶¶ 159-74. He also brings claims against Erie County arising out of the July 17 incident at the Erie County Building.[6] *Id.* at ¶¶ 175-210. The Erie County defendants have moved to dismiss Harris's claims against them, arguing that Harris's constitutional claims are substantively deficient and barred by qualified immunity.[7] Docket Item 9-2.

---

[6] Harris also brings claims against the New York State defendants, two Buffalo police officers, and the City of Buffalo arising out of the July 17 incident. *See* Docket Item 3 at ¶¶ 175-210. But he does not name any individual Erie County defendants in those claims.

[7] The Erie County defendants also have moved to dismiss any standalone claims brought under 42 U.S.C. § 1983, arguing that section 1983 does not provide a basis for an independent claim. Docket Item 9-2 at 13. Of course, "[s]ection 1983 itself creates

For the reasons stated below, Harris's First Amendment claim against the individual Erie County defendants, as well as his Fourth Amendment unreasonable seizure and excessive force claims against Alabanese, Roetzer, and Wahl, may proceed.  Harris's Fourth Amendment unreasonable seizure and excessive force claims against Bishop are dismissed.  Harris's remaining claims against the Erie County defendants are subject to dismissal, but he may amend those claims to correct the deficiencies noted below.

### A.   Claims Against the Individual Erie County Defendants

#### 1.   First Amendment

Harris alleges that Alabanese, Bishop, Roetzer, and Wahl violated his First Amendment rights by removing him from the Erie County DMV after he refused to stop video recording.  Docket Item 3 at ¶¶ 159-62.  Because Harris's First Amendment claim relates to speech that occurred inside a government building, that claim "implicates [the] 'forum[-]based' approach for assessing restrictions that the government seeks to place on the use of its property."  *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992)).

The Supreme Court has "recognize[d] three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums."  *Id.*

---

no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).  But Harris does not allege that his rights under section 1983 were violated; instead, he alleges that the Erie County defendants violated his constitutional rights and brings claims under section 1983 to challenge those violations.  *See generally* Docket Item 3. Because that is how a plaintiff raises a claim under section 1983, *see, e.g.*, *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997), the Court does not further address any purported standalone claim under section 1983.

"[M]embers of the public retain strong free speech rights when they venture into" traditional public forums, or spaces that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)); *see also Minn. Voters All.*, 138 S. Ct. at 1885 (noting that traditional public forums include "parks, streets, sidewalks, and the like").  In traditional public forums, "the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Minn. Voters All.*, 138 S. Ct. at 1885.  "The same standards apply in designated public forums—spaces that have 'not traditionally been regarded as a public forum' but which the government has 'intentionally opened up for that purpose.'" *Id.* (quoting *Pleasant Grove City*, 555 U.S. at 469-70).

By contrast, "[p]ublic property which is not by tradition or designation a forum for public communication is governed by different standards." *Perry Educ. Ass'n*, 460 U.S. at 46.  In such a "nonpublic forum," the government "has much more flexibility to craft rules limiting speech." *Minn. Voters All.*, 138 S. Ct. at 1885.  "The government may reserve such a forum 'for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* (quoting *Perry Educ. Ass'n*, 460 U.S. at 46).

The Erie County defendants say that the Erie County DMV is a nonpublic forum,
*see* Docket Item 9-2 at 8 (citing *Harmon v. Bogart*, 500 F. Supp. 3d 8, 19 (W.D.N.Y.
2020)), which this Court accepts as true for the purposes of this motion.   The Erie
County defendants then argue that "[t]he decision to remove [Harris] from the [Erie
County] DMV lobby" therefore was lawful because "[a]t the time of his removal, [Harris]
was not conducting legitimate business" and instead "was creating a substan[tial]
interruption in the workplace."[8]   *Id.*

Not surprisingly, Harris sees things differently:   He alleges that he visited the Erie
County DMV because he "needed assistance regarding the whereabouts of his record,"
Docket Item 3 at ¶ 120, and he maintains that he was not disturbing anyone or anything
there, *see* Docket Item 16 at 13 (arguing that the Erie County defendants did not
"mention the reasoning of his alleged disruption other than recording public officials in
the course of their duties in a publicly accessible lobby").

In other words, the parties dispute whether Harris was creating a disturbance
during his visit to the Erie County DMV and whether it therefore was lawful to remove
him from the building.   And that sort of "factual dispute . . . c[annot] be[] resolved on a
motion to dismiss under Rule 12(b)(6)."   *Ray v. Weit*, 708 F. App'x 719, 722 (2d Cir.
2017) (summary order) (citing *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d
395, 405 (2d Cir. 2015)); *see also Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 140

---

[8] This Court assumes that Harris's filming was protected under the First
Amendment. *See, e.g.*, *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044
(9th Cir. 2018) ("The First Amendment protects the right to photograph and record
matters of public interest.").  Although the Erie County defendants argue in passing that
Harris's "video recording was not constitutionally protected expression," Docket Item 9-2
at 9, that argument appears to be based only on their contention that Harris's speech
was lawfully restricted in a nonpublic forum.

(E.D.N.Y. 2015) ("[I]ssues of fact, credibility, and [] weight of the evidence are not properly considered on a motion to dismiss.").

What is more, the Erie County defendants do not point to any particular law or regulation that authorized Harris's removal from the Erie County DMV; they do not say, for example, that Harris was present at the Erie County DMV when the public was not welcome there or that video recording is prohibited in the Erie County DMV under some or all circumstances.[9]  Instead, they simply say that Harris's removal was "reasonable" because he was "causing a disruption."  Docket Item 9-2 at 8-9.  And whether that conclusion is correct depends upon whether the fact upon which it is based is correct— that is, whether Harris was causing a disruption.

"Although there is no requirement of narrow tailoring in a nonpublic forum, the [government] must be able to articulate some sensible basis for distinguishing what may come in from what must stay out."  *Minn. Voters All.*, 138 S. Ct. at 1888; *see also id.* at 1891 ("It is 'self-evident' that an indeterminate prohibition carries with it 'the opportunity for abuse, especially where it has received a virtually open-ended interpretation.'" (alterations omitted) (quoting *Bd. of Airport Comm'rs of City of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987))).  So apart from raising the sort of fact-bound questions that are not amenable to resolution on a motion to dismiss, the Erie County defendants' self-serving assertion that their conduct was reasonable simply begs the question.  And without some other basis to conclude that Harris's removal from the Erie County DMV

---

[9] For that reason, this Court does not now pass on whether any such restriction would be permissible under the First Amendment.

was reasonable, this Court cannot dismiss Harris's First Amendment claim against the individual Erie County defendants at this stage.

For those reasons, Harris has pleaded a viable First Amendment claim against Alabanese, Bishop, Roetzer, and Wahl.

### 2. Fourth Amendment[10]

#### a. Unreasonable Seizure

Harris alleges that Alabanese, Bishop, Wahl, and Roetzer violated the Fourth Amendment by removing him from the Erie County DMV and then barring him from reentering the building. Docket Item 3 at ¶¶ 167-74. The Erie County defendants argue that "[t]hese actions do not equate to a Fourth Amendment" violation because "being removed from [a] building does not constitute a Fourth Amendment violation." Docket Item 9-2 at 10. Although that is correct in certain circumstances, Harris has pleaded a viable unreasonable seizure claim here.

"In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court ruled that a person is seized 'when an officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen.'" *Salmon v. Blesser*, 802 F.3d 249, 252 (2d Cir. 2015) (alterations omitted) (quoting *Terry*, 392 U.S. at 19 n.16). "To explain when a sufficient

---

[10] Harris brings three Fourth Amendment claims related to his removal from the Erie County DMV: one for excessive force; one for "removing from free access to public areas"; and one for "unlawful trespass/chill of movement" and "restriction to go back into . . . public areas." Docket Item 3 at ¶¶ 163-74. Because Harris is proceeding *pro se*, the Court liberally construes those latter two claims as an unreasonable seizure claim. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) ("[S]ubmissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." (citation and internal quotation marks omitted)).

'show of authority' effects restraint, the Supreme Court has relied on a totality-of-the-circumstances test, asking whether a reasonable person would believe that he was 'not free to leave.'"[11]  *Id.* (quoting *INS v. Delgado*, 466 U.S. 210, 215 (1984)).

Harris does not allege that he was not free to leave the Erie County DMV and therefore end the encounter with the Erie County Sheriff's Department officers.  In fact, leaving the building is exactly what the officers asked him to do.  *See* Docket Item 3 at ¶¶ 132-34.  In other words, Harris's Fourth Amendment unreasonable seizure claim is based on his being forced to leave the Erie County DMV, not his inability to do so.  *See* Docket Item 16 at 19.

"Police officers frequently order persons to leave public areas: crime scenes, accident sites, dangerous construction venues, anticipated flood or fire paths, parade routes, areas of public disorder, etc."  *Salmon*, 802 F.3d at 253.  "A person may feel obliged to obey such an order," and the police "may take a person by the elbow or employ comparable guiding force short of actual restraint to ensure obedience with a departure order."  *Id.*  But even if a person feels compelled to leave because of an officer's order—and is potentially helped along by an officer's "guiding force"—that is not necessarily a Fourth Amendment seizure because "the person is otherwise free to go where he wishes."  *Id.*; *see also Maxwell v. City of New York*, 102 F.3d 664, 668 n.2 (2d

---

[11] In other circumstances, where an individual's "freedom of movement [is] restricted by a factor independent of police conduct," the "appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  *Florida v. Bostick*, 501 U.S. 429, 436 (1991).  Because Harris does not allege that some independent factor restricted his movement, that standard does not apply.  *See id.* (finding "the 'free to leave' analysis . . . inapplicable" where the individual's "freedom of movement was restricted by a factor independent of police conduct—*i.e.*, by his being a passenger on a bus").

Cir. 1996) (noting that refusing entrance to an area is not itself a Fourth Amendment seizure); *Sheppard v. Beerman*, 18 F.3d 147, 153 (2d Cir. 1994) (fired law clerk was not seized when he was "escorted out of the courthouse by court officers" because he was "free to go anywhere else that he desired, with the exception of [the judge's] chambers and the court house" (internal quotation marks omitted)).  So the mere fact that Harris was not free to remain in or return to the Erie County DMV does not itself state a viable Fourth Amendment claim.[12]

But Harris alleges that he was removed from the Erie County DMV with more than just "guiding force."  In fact, he says that he was—without warning—"grab[bed] by the shirt and physically shov[ed]" out of the building.  Docket Item 3 at ¶ 136.  And in *Salmon*, the Second Circuit held that "an order to depart a public place" that "is accompanied by the use of sufficient force intentionally to restrain a person and gain control of his movements" can be a Fourth Amendment seizure.  *Id.* at 255; *see also id.* at 254 ("Whatever other actions might effect a Fourth Amendment seizure of a person ordered to depart a public area, the intentional use of physical force to restrain the person and control the movements of a compliant person certainly does.").  So Harris has plausibly alleged that he was seized when he was forcibly removed from the Erie County DMV.

---

[12] Harris cites *Bennett v. City of Eastpointe*, 410 F.3d 810 (6th Cir. 2005), to argue that "a person is seized not only when a reasonable person would not feel free to leave an encounter with police, but also when a reasonable person would not feel free to remain somewhere, by virtue of some official action."  Docket Item 16 at 19 (quoting *Bennett*, 410 F.3d at 834).  But in *Salmon*, the Second Circuit specifically declined to follow *Bennett*.  *See Salmon*, 802 F.3d at 253 n.4.

That does not necessarily mean that Harris's removal was unreasonable.  *See id.* at 255 ("Whether such a . . . seizure is reasonable is of course another question.").  But as noted above, deciding whether Harris's removal was reasonable depends on resolving the parties' factual dispute about whether Harris was creating a disruption at the Erie County DMV.  And absent any additional argument about why Harris's Fourth Amendment unreasonable seizure claim fails, that claim may proceed against Alabanese, Roetzer, and Wahl.

The Court, however, agrees with the Erie County defendants that Harris has not alleged that Bishop was personally involved in any constitutionally impermissible seizure.[13]  A defendant "must have been personally involved in a constitutional deprivation to be held liable under [section] 1983."  *Flannery v. City of Rochester*, 640 F. Supp. 3d 267, 279 (W.D.N.Y. 2022); *see also Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) ("[A] plaintiff must plead and prove 'that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution.'" (quoting *Iqbal*, 556 U.S. at 676)).  Harris alleges that Alabanese, Roetzer, and Wahl were the only ones who used force to remove him from the Erie County DMV.  *See* Docket Item 3 at ¶¶ 136-39.  And in his response to the Erie County defendants' motion to dismiss, Harris does not say that Bishop used any force against him or otherwise show how Bishop might have violated the Fourth Amendment by "intentionally restraining and controlling [his] movements."  *Salmon*, 802 F.3d at 254.  Instead, he generally maintains that Bishop "was the mastermind of the entire incident" because

---

[13] Although the Erie County defendants say that Bishop was not personally involved in Harris's removal, *see* Docket Item 9-2 at 11-12, they do not differentiate among Alabanese's, Roetzer's, and Wahl's involvement.

she "escalat[ed] the incident to enforce her feelings" and that she "allow[ed] Wahl, Roetzer, and Al[a]banese to lock the [Erie County DMV] doors during business hours." Docket Item 16 at 22.  Because Harris does not allege that Bishop was personally involved in any application of force, that claim is dismissed.

### b.   Excessive Force

Harris also alleges that Alabanese, Bishop, Wahl, and Roetzer violated the Fourth Amendment by using excessive force in removing him from the Erie County DMV office.  Docket Item 3 at ¶¶ 163-66.  "All claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard."  *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 148 (2d Cir. 2021) (alterations omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  Under that standard, "[p]olice officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'"  *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham*, 490 U.S. at 397).

The Erie County defendants say that Harris's excessive force claim is not viable because "the amount of force used in 'shoving' [Harris] was *de minimis*."  Docket Item 9-2 at 11 (italicization added).  And to be sure, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Graham*, 490 U.S. at 396 (citation omitted).  But Harris says that the officers "grabb[ed him] by the shirt[,] physically shov[ed him] through the lobby area towards the doors," and then "shov[ed] him through the doorway, out of the building, and [on to] the sidewalk."  Docket Item 3 at ¶¶ 136-37.  Moreover, Harris says that he

17

suffered "pain" and "extreme emotional stress" as a result of those actions. *Id.* at ¶¶ 165-66. At the motion to dismiss stage, where all of Harris's allegations must be accepted as true and all reasonable inferences drawn in his favor, this Court cannot conclude that Harris's excessive force claim involves force that was *de minimis*. *See Colon v. City of Rochester*, 419 F. Supp. 3d 586, 600 (W.D.N.Y. 2019) ("Despite the relatively modest level of force alleged, the Court cannot determine now, as a matter of law, that the force used was *de minimis*, as would be required to support dismissal of the[ excessive force] claims."). Harris's Fourth Amendment excessive force claim therefore may proceed against Alabanese, Roetzer, and Wahl. For the reasons stated above, however, Harris's excessive force claim against Bishop is dismissed because Harris does not allege that Bishop used any force against him, excessive or not.

### 3. Fourteenth Amendment

In addition to his First and Fourth Amendment claims, Harris also refers to the Fourteenth Amendment in his amended complaint. *See* Docket Item 3 at ¶¶ 159-74. The Erie County defendants argue that any Fourteenth Amendment claims must be dismissed because Harris "merely cit[es] the Fourteenth Amendment as a ground for relief without any factual allegations" showing that his rights under the Fourteenth Amendment were violated. Docket Item 9-2 at 12.

But Harris does not bring any standalone Fourteenth Amendment claims in the amended complaint; instead, he refers to the Fourteenth Amendment in tandem with the First and Fourth Amendments. *See* Docket Item 3 at ¶¶ 159-74. And the Fourteenth Amendment incorporates certain constitutional protections—including those in the First and Fourth Amendments—against state action. *See Zalewska v. County of Sullivan*,

316 F.3d 314, 319 (2d Cir. 2003) (noting that the Fourteenth Amendment incorporates the First Amendment's protections); *Tenenbaum v. Williams*, 193 F.3d 581, 602 n.14 (2d Cir. 1999) (same for the Fourth Amendment). So there are not any independent Fourteenth Amendment claims to dismiss. *See, e.g.*, *Morey v. Somers Cent. Sch. Dist.*, 2007 WL 867203, at *13 (S.D.N.Y. Mar. 21, 2007) (declining to address motion to dismiss Fourteenth Amendment claims where "[the p]laintiff's reference to the Fourteenth Amendment merely refers to the First Amendment's application via its incorporation under the Fourteenth Amendment[]").

### 4.   Qualified Immunity

The individual Erie County defendants also say that they are entitled to qualified immunity. Docket Item 9-2 at 16-17. Officials "are entitled to qualified immunity under [section] 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (citation and internal quotation marks omitted). Stated differently, "[a] defendant is entitled to qualified immunity if (1) the defendant's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for the defendant to believe that [his or her] actions were lawful at the time of the challenged act." *Brandon v. Kinter*, 938 F.3d 21, 39 (2d Cir. 2019) (alterations, citation, and internal quotation marks omitted). "Because, on a Rule 12(b)(6) or 12(c) motion, 'the facts supporting the qualified immunity defense must appear on the face of the complaint,' asserting qualified immunity as a defense in the earliest stages of litigation, before development of a relevant factual record, usually fails to result in dismissal of the

complaint." *Pourkavoos v. Town of Avon*, 823 F. App'x 53, 59 (2d Cir. 2020) (summary order) (alterations omitted) (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)); *see also Chamberlain v. City of White Plains*, 960 F.3d 100, 111 (2d Cir. 2020) ("[A] qualified immunity defense presented on a Rule 12(b)(6) motion faces a formidable hurdle and is usually not successful." (alterations, citation, and internal quotation marks omitted)).

Here, the individual Erie County defendants offer the conclusory assertion that their conduct "was reasonable and did not violate any federally protected rights." Docket Item 9-2 at 16-17.  But apart from generally maintaining that they "acted reasonably in carrying out their professional duties," *id.* at 17, the individual Erie County defendants do not otherwise develop their qualified immunity argument.  So the individual Erie County defendants have not shown that they are entitled to qualified immunity based on the "face of the complaint."  *See McKenna*, 386 F.3d at 436; *see also Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013) ("Qualified immunity[ is] an affirmative defense on which the defendant officials bear the burden of proof . . . ."); *A.S. v. City Sch. Dist. Albany*, 585 F. Supp. 3d 246, 280 (N.D.N.Y. 2022) (denying motion to dismiss based on qualified immunity because "[t]he [d]efendants' conclusory, one-sentence argument fails to demonstrate how they are entitled to qualified immunity at the pleadings stage"); *Ziemba v. Lynch*, 2013 WL 5232543, at *9 (D. Conn. Sept. 17, 2013) (denying motion to dismiss based on qualified immunity where the defendant "only include[d] the legal standard for establishing qualified immunity and, in a conclusory manner, state[d] that the claims against [her] are subject to dismissal based on the law of qualified immunity").

### B.    Claims Against Erie County

Harris also brings claims against Erie County in connection with the July 8 and the July 17 incidents.  *See* Docket Item 3 at ¶¶ 159-88, 208-10.  A municipality cannot be held liable under section 1983 unless the challenged action was undertaken pursuant to a municipal policy, custom, or practice.  *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).  To state a claim under *Monell*, a plaintiff must plead three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).  To satisfy the first element, a plaintiff may establish a policy or practice by alleging

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising [policymaker] must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (citations omitted); *see also Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015) (summary order) ("[A] plaintiff must allege the existence of a formal policy which is officially endorsed by the municipality[;] or a practice so persistent and widespread that it constitutes a custom or usage of which supervisory authorities must have been aware[;] or that a municipal custom, policy, or usage can be inferred from evidence of deliberate indifference of supervisory officials to such abuses."); *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) ("Where a plaintiff seeks to hold a

municipality liable for a single decision by a municipal policymaker, the plaintiff must show that the official had final policymaking power [and] the challenged actions must be within that official's area of policymaking authority." (alterations, citations, and internal quotation marks omitted)).

### 1.   July 8 Incident

Harris's claims against Erie County related to the July 8 incident are subject to dismissal.  First, Harris has not alleged that any of the First or Fourth Amendment violations at the DMV were undertaken pursuant to an official policy or a widespread custom, and, as noted above, the Erie County defendants do not say that Harris was barred from filming under any particular policy.  Nor has Harris challenged any action taken by a municipal policymaker "within that official's area of policymaking authority." *Roe*, 542 F.3d at 37.  Instead, Harris's claims against Erie County in connection with the July 8 incident are based solely on his interactions with employees at the Erie County DMV and from the Erie County Sherriff's Department.  *See* Docket Item 3 at ¶¶ 159-74. And that is not enough to plausibly allege that any unlawful conduct occurred because of an "affirmative municipal policy."  *See Missel v. County of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (summary order); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy[ that] can be attributed to a municipal policymaker.").

Nor has Harris alleged that Erie County is liable for failing to train, supervise, or discipline its employees.  *See Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir.

2007).  "Where plaintiffs seek to hold a municipality liable under a theory of failure to [train,] supervise[,] or discipline, . . . they must also show that the municipal policymaker acted with deliberate indifference."  *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014) (citing *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989)). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his [or her] action."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation and internal quotation marks omitted).

"To establish 'deliberate indifference,' a plaintiff must show that [1] a policymaker knows to a moral certainty that [municipal] employees will confront a particular situation; [2] the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or there is a history of employees mishandling the situation; and [3] the wrong choice by the [municipal] employee will frequently cause the deprivation of a citizen's constitutional rights."  *Wray*, 490 F.3d at 195-96 (citation and internal quotation marks omitted).  Alternatively, "deliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to [the] plaintiff[]."  *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (alterations, citations, and internal quotation marks omitted).  "While the Supreme Court has left open the possibility that a single incident could give rise to liability for failure to train or supervise, the Court has cautioned that only a 'narrow range' of circumstances would support such single-incident liability, where the 'unconstitutional consequences of failing to train were patently obvious.'"  *Schnitter v. City of Rochester*, 931 F. Supp. 2d 469, 475 (W.D.N.Y. 2013) (alterations

omitted) (quoting *Connick*, 563 U.S. at 63), *aff'd*, 556 F. App'x 5 (2d Cir. 2014).

Similarly, the Second Circuit has noted that a policy of acquiescing in or ratifying illegal

conduct "cannot be inferred from the failure of those in charge to discipline a single

police officer for a single incident of illegality; instead, there must be more evidence of

supervisory indifference, such as acquiescence in a prior pattern of conduct." *Lucente*

*v. County of Suffolk*, 980 F.3d 284, 306 (2d Cir. 2020) (citation and internal quotation

marks omitted).

Harris has not alleged anything that would show how Erie County is liable for

failing to train, discipline, or supervise its employees.  Indeed, Harris's allegations about

his experience at the Erie County DMV relate only to the July 8 incident, not some

broader pattern of violations that might demonstrate a failure to train, discipline, or

supervise.  *See, e.g.*, *D'Alessandro v. City of New York*, 713 F. App'x 1, 10-11 (2d Cir.

2017) (summary order) ("To establish a 'failure to train' claim, a plaintiff must generally

demonstrate that there has been a 'pattern of similar constitutional violations by

untrained employees.'" (quoting *Connick*, 563 U.S. at 62)); *Vann v. City of New York*, 72

F.3d 1040, 1049 (2d Cir. 1995) ("To prove[] deliberate indifference, the plaintiff must

show that the need for more or better supervision to protect against constitutional

violations was obvious," such as through "proof of repeated complaints of civil rights

violations[] . . . followed by no meaningful attempt on the part of the municipality to

investigate or to forestall further incidents."); *Askew v. Lindsey*, 2016 WL 4992641, at *5

(S.D.N.Y. Sept. 16, 2016) (collecting cases holding that a single failure to discipline

"cannot give rise to an inference of deliberate indifference without further evidence of a

municipal policy or practice").

Nor does Harris's Erie County DMV visit present the sort of "rare" circumstance in which a municipality might be held liable for its failure to train based on a single incident of alleged misconduct.  *See Connick*, 563 U.S. at 64.  In *Connick*, the Supreme Court distinguished the "hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force."  *Id.* at 63 (citing *Canton*, 489 U.S. at 390 n.10).  In that scenario, "[g]iven the known frequency with which police attempt to arrest fleeing felons and the 'predictability that an officer lacking specific tools to handle that situation will violate citizens' rights,'" a municipality's failure to train its officers "could reflect the city's deliberate indifference to the 'highly predictable consequence[s]'" of the untrained officers' actions.  *Id.* at 63-64 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).

Here, by contrast, Harris's claims arise in the particular circumstances of his encounter with employees at the Erie County DMV.  And those claims do not point to any Erie County employee's "utter lack of [] ability to cope with constitutional situations" that would make it a "highly predictable consequence" that Erie County employees would violate Harris's constitutional rights.  *See id.* at 64, 67.  Harris therefore has not alleged a viable *Monell* claim based on the single incident of his July 8 visit to the Erie County DMV.  Nevertheless, and in light of his *pro se* status, Harris may amend his complaint to allege viable claims against Erie County based on that incident.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## 2.     July 17 Incident

For different reasons, Harris's claims against Erie County related to the July 17

incident also are not viable.  "*Monell* liability attaches only where an infringement of

constitutional rights is caused by a local government policy."  *Bellamy v. City of New*

*York*, 914 F.3d 727, 757 (2d Cir. 2019).  In other words, whether a municipality can be

liable for constitutional violations depends on "which governmental entity (the state or

the municipality) is responsible for a given function."  *Id.* at 760.

Harris says that he was told to stop filming by New York State officers, not

anyone employed by Erie County.  Docket Item 3 at ¶¶ 11, 141-49.  And, as noted

below, he disputes that he was violating a particular New York State law that prohibits

filming in a courthouse.  That is, Harris's claims related to the July 17 incident take aim

at state officers' enforcement of a state law prohibiting video recording in courthouses.

Those claims all relate to New York State officers' enforcement of New York State law,

and Harris's claims against Erie County for the July 17 incident therefore are subject to

dismissal.

Harris nevertheless maintains that the officers "were enforcing Erie County's

[p]olic[y] of not recording in the lobbies of the building."  Docket Item 16 at 24-25.  But "a

general and conclusory allegation of a municipal policy or custom fails to state a

plausible claim."[14]  *Green v. Dep't of Educ. of City of N.Y.*, 16 F.4th 1070, 1077 (2d Cir.

_____

[14] As noted below, however, this Court is not at this time deciding whether a
broad prohibition on filming inside the Erie County Building—including any policy that is
attributable to Erie County—is permissible under the First Amendment.  And any such
prohibition may affect the viability of Harris's claims related to the July 17 incident.  *See,
e.g.*, *Rouzan v. Dorta*, 2014 WL 1716094, at *4-13 (C.D. Cal. Mar. 12, 2014)
(recommending summary judgment be granted on First and Fourth Amendment claims
where the plaintiff violated prohibition on filming inside a courthouse), *adopted*, 2014
WL 1725783 (C.D. Cal. May 1, 2014).  In other words, if Harris's video recording was in

2021) (citation and internal quotation marks omitted).  So Harris's bald allegation of an Erie County policy cannot salvage his claim.

Nevertheless, and in light of his *pro se* status, Harris may amend his complaint to allege a viable claim against Erie County related to the July 17 incident.  *See Cuoco*, 222 F.3d at 112.

## II.    THE NEW YORK STATE DEFENDANTS' MOTION TO DISMISS

Harris brings claims against the New York State defendants for violating his First and Fourth Amendment rights during the July 17 incident and as part of the ensuing arrest and prosecution.[15]  Docket Item 3 at ¶¶ 175-207.  The New York State defendants argue that those claims should be dismissed because Harris violated a prohibition on filming inside the Erie County Building and because he was lawfully arrested and prosecuted for violating that prohibition.  *See* Docket Item 26-1.  And the New York State defendants say that Harris's claims suffer from a number of other substantive deficiencies.  *See id.*  The New York State defendants do not, however, raise a qualified immunity defense.[16]  *See id.*

─────────────────────

fact barred by some Erie County policy, and if that policy is lawful, that may well bar many or all of Harris's claims arising out of the July 17 incident, including Harris's *Monell* claim against Erie County.

[15] Harris also brings some of those claims against Khalil, Wise, the City of Buffalo, and Erie County.  *See, e.g.*, Docket Item 3 at ¶¶ 178-80.  For the reasons stated above, Harris's claims against Erie County, including any claims arising out of the July 17 incident, are subject to dismissal.  And because Khalil, Wise, and the City of Buffalo have answered the amended complaint instead of moving to dismiss it, Docket Item 15, this decision does not address whether Harris's claims against those defendants are viable.

[16] The New York State defendants argue that sovereign immunity bars any claims against them in their official capacity.  *See* Docket Item 26-1 at 4-5.  Harris does

For the reasons stated below, Harris's official-capacity claims against the New York State defendants and his "supervisory negligent liability" claim against McEvoy, Perry, and Schumacher are dismissed.  Harris's malicious prosecution claim against McEvoy, as well as his First Amendment claim, some of his Fourth Amendment claims, and his false arrest claim against the New York State defendants, may proceed.  His remaining claims against the New York State defendants are subject to dismissal, but he may amend those claims as noted below.

### A.      First Amendment

Harris's First Amendment claim against the New York State defendants essentially mirrors his First Amendment claim against the Erie County defendants.  He says that he entered the Erie County Building to "file a compl[aint]" related to the July 8 incident and was "immediately [] given [a] directive[] to stop recording."[17]  Docket Item 3 at ¶ 141.  And he says that when he refused to do so and instead asked the officers to "articulate the law" that barred video recording, he was "informed . . . that he was now trespassing," was "grabbed . . . without any warning," and was "taken into custody."  *Id.* at ¶¶ 143, 147-49.

The New York State defendants say that Harris's First Amendment claim lacks merit because he violated a reasonable restriction on First Amendment activity in a nonpublic forum.  *See* Docket Item 26-1 at 14-16.  More specifically, they note that New

---

not dispute this, Docket Item 29 at 6-7, and any official-capacity claims against the New York State defendants therefore are dismissed.

[17] For the reasons stated above, this Court assumes that Harris's video recording was protected by the First Amendment.

York State law prohibits "[t]aking photographs, films or videotapes, or audiotaping, broadcasting or telecasting, in a courthouse including any courtroom, office or hallway thereof, at any time or on any occasion, whether or not the court is in session" without prior authorization.  *See id.* at 15 (citing N.Y. Comp. Codes R. & Regs. tit. 22, § 29.1 ("Chief Judge Rule 29")).  Because Chief Judge Rule 29 is a reasonable, viewpoint-neutral restriction of speech in a nonpublic forum, the New York State defendants say, Harris does not have a viable First Amendment claim related to his inability to film inside the Erie County Building.  *See id.* at 14-17.

Again, Harris sees things differently.  He "respectfully request[s] that the [Court] take judicial notice . . . that [the] [July 17] incident did not take place in [a] 'Courthouse.'" Docket Item 29 at 8.  Instead, he says, the Erie County Building houses "multiple agencies giving different services to the public," some of which "ha[ve] nothing to do with any court function, particularly" in the area "where the incident took place"—"the lobby outside of the tax office."  *Id.*  In fact, Harris says, there are specific signs in the building "indicating that the entry of the Erie County Court[house] [is] located on the upper floors" of the building.  *Id.*

So Harris raises a dispute about whether he actually violated Chief Judge Rule 29 by filming in the Erie County Building.  For the same reasons already stated, that sort of factual dispute is not amenable to resolution on a motion to dismiss.  And the New York State defendants did not take the opportunity to reply in further support of their motion to dismiss and explain why Harris might be mistaken or otherwise might still have violated Chief Judge Rule 29.  Without some further indication of how Harris's conduct violated some reasonable restriction on his First Amendment rights, the Court

concludes that he has pleaded a viable First Amendment claim against the New York State defendants.[18]  *Cf. Enoch v. Hogan*, 728 F. App'x 448, 456 (6th Cir. 2018) ("accept[ing the plaintiffs'] allegation that they had violated no rule or law" in filming in the courthouse hallway and affirming denial of qualified immunity on First Amendment claim).

### B.      Fourth Amendment

#### 1.      False Arrest/False Imprisonment

Harris also brings a false arrest and false imprisonment claim against the New York state defendants.[19]  Docket Item 3 at ¶¶ 175-77.  "A [section] 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law."  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted).  "Under New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged."  *Ashley v. City of*

---

[18] The Court does not decide whether Harris violated Chief Judge Rule 29, and the factual disputes that prevent dismissal of that claim now may well be resolved at a later stage of this case.  Nor does this Court address whether any other prohibition on filming inside the Erie County Building is permissible under the First Amendment and therefore whether Harris was lawfully arrested for violating any such prohibition.

[19] Because "[f]alse arrest is simply false imprisonment accomplished by means of an unlawful arrest," *see Jenkins v. City of New York*, 478 F.3d 76, 88 n.10 (2d Cir. 2007), this Court refers to Harris's "false arrest/false imprisonment" claim as a false arrest claim.

*New York*, 992 F.3d 128, 136 (2d Cir. 2021) (alterations, citation, and internal quotation marks omitted).

An arrest is privileged if it was made with probable cause. *See id.* ("Probable cause to arrest is a complete defense to an action for false arrest."). "Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014).

The New York State defendants argue that they had probable cause to arrest Harris for violating New York Penal Law § 140.05.[20]   Docket Item 26-1 at 10.  New York Penal Law § 140.05 provides that "[a] person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises."  "A person 'enters or remains unlawfully' in or upon premises when he is not licensed or privileged to do so."  N.Y. Penal Law § 140.00(5).  And "[a] person who[] . . . enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or other authorized person."  *Id.*  "Accordingly, to establish probable cause for arresting" Harris "for criminal trespass," the New York State defendants "must show that (1) there was a lawful order excluding [Harris] from the property; (2) that the order was communicated to him by a person with authority to

---

[20] The New York State defendants do not argue that there was probable cause to arrest Harris for violating any other law.

give the order; and (3) that [he] defied the order." *Yorzinski v. City of New York*, 175 F. Supp. 3d 69, 77 (S.D.N.Y. 2016).

Harris says that he "entered the lobby within the publicly accessible area [of] the Erie County Building" and was "immediately [] given directives to stop recording." Docket Item 3 at ¶ 141. Harris apparently refused to do so and instead "repeatedly asked" the officers "to articulate the law" that barred his recording. *Id.* at ¶¶ 143, 146. After Harris was "informed . . . that he was now trespassing," he then was "grabbed . . . without any warning" and arrested. *Id.* at ¶¶ 147-49. Based on all that, the New York State defendants argue that the officers had probable cause to arrest Harris because he violated Chief Judge Rule 29, was therefore asked to leave the premises, and refused to do so. *See* Docket Item 26-1 at 10-11.

But as mentioned above, there is a factual dispute as to whether Harris violated Chief Judge Rule 29. And again, the New York State defendants have not taken the opportunity to reply in support of their motion to dismiss and explain why that dispute would not affect any probable cause analysis. For those reasons, this Court cannot conclude at this stage that Harris refused a lawful order to leave the Erie County Building and that his arrest therefore was supported by probable cause. *See Gerskovich v. Iocco*, 2017 WL 3236445, at *4 (S.D.N.Y. July 17, 2017) (denying summary judgment on false arrest claim because "[t]here is a sharp dispute as to where [the p]laintiff was standing, the nature of [his] conduct, and whether there was probable cause to arrest [the p]laintiff for trespass and/or disorderly conduct" (citation and internal quotation marks omitted)); *Yorzinski*, 175 F. Supp. 3d at 77-78 (denying summary judgment on false arrest claim where "[the d]efendants have not established that [the

plaintiff's] removal from Yankee Stadium constituted a lawful order to leave all Yankees-owned property[] . . . such that [the officer] had probable cause to arrest [the plaintiff] for criminal trespass"); *see also Enoch*, 728 F. App'x at 453-55 (accepting the plaintiffs' allegations that they did not violate rule prohibiting filming inside courthouse and affirming denial of qualified immunity on Fourth Amendment claims).  For those reasons, Harris's false arrest claim against the New York State defendants may proceed.

### 2.    Malicious Prosecution

Harris also brings a malicious prosecution claim against the New York State defendants.  Docket Item 3 at ¶¶ 178-80.  "To prevail on a malicious prosecution claim under New York law and federal law, a plaintiff must show: (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding[,] and (4) actual malice."  *Kee v. City of New York*, 12 F.4th 150, 161-62 (2d Cir. 2021) (citation and internal quotation marks omitted).  "For a malicious prosecution claim under [s]ection 1983, a plaintiff also must demonstrate a 'sufficient post-arraignment liberty restraint.'"  *Id.* (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)).

The New York State defendants first argue that "there are no factual allegations that plausibly suggest that [they] acted with malice in filing criminal charges."  Docket Item 26-1 at 12.  But "[a] lack of probable cause generally creates an inference of malice" for a malicious prosecution claim.  *See Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003).  For the same reasons that this Court found that the New York State

defendants have not established probable cause to arrest Harris, *see supra* at 30-33, the Court finds that they have not met their burden of establishing probable cause to charge and prosecute him.[21]  *See Kee*, 12 F.4th at 166 ("Probable cause, in the context of malicious prosecution, has been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." (alterations omitted)). And because there is a question of fact as to probable cause, there is also a question of fact as to actual malice.

But Harris has not alleged a viable malicious prosecution claim against every New York State defendant.  "While police officers do not generally 'commence or continue' criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer is found to 'play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'"  *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (alterations omitted) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010)).  A plaintiff also may show that an officer commenced or continued criminal proceedings "by showing that [the] officer[] brought formal charges and had the person arraigned, or filled out complaining and corroborating affidavits, or swore to and signed a felony complaint."  *Rodriguez v. City of New York*, 590 F. Supp. 3d 518, 534 (E.D.N.Y.

---

[21] What is more, the New York State defendants address only whether there was probable cause to charge Harris with trespassing.  *See* Docket Item 26-1 at 11-12. "Although probable cause to prosecute is a complete defense to a claim of malicious prosecution, such probable cause must be shown as to each crime charged in the underlying criminal action."  *Kee*, 12 F.4th at 166 (citations omitted).  So even if there were probable cause to charge Harris with trespassing, the New York State defendants have not shown that there was probable cause to charge Harris with the other offenses with which he was charged.

2022) (quoting *Llerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2005)); *see also Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("Under New York law, police officers can 'initiate' prosecution by filing charges or other accusatory instruments.").  "In addition, a police officer may be held liable for malicious prosecution when he creates false information likely to influence a jury's decision and forwards that information to prosecutors."  *Maldonado v. City of New York*, 2014 WL 787814, at *6 (S.D.N.Y. Feb. 26, 2014) (citation and internal quotation marks omitted).

McEvoy signed a charging instrument, and he therefore can be held liable for malicious prosecution.  *See* Docket Item 26-2 at 3-6 (four criminal complaints signed by McEvoy).  But Harris does not explain how the other New York State defendants—all officers who allegedly were involved in Harris's arrest—played some role in Harris's prosecution that might subject them to liability for malicious prosecution.[22]  For that reason, Harris's malicious prosecution claims against Costa, Deneka, Hewitt, Perry, Schumacher, Schrier, and Stark are subject to dismissal.  *See, e.g.*, *Pierre v. Rocco*, 2021 WL 950021, at *3 (E.D.N.Y. Mar. 12, 2021) ("It has long been settled that participation in the arrest, without more, is insufficient to establish the requisite initiation [of criminal proceedings].").  Nevertheless, in light of his *pro se* status, Harris may

---

[22] Harris does allege that some defendants "maliciously and callously falsified official documents in order to add more charges to . . . prolong [the] unreasonable prosecution."  Docket Item 3 at ¶ 179.  Because Harris brings a malicious prosecution claim against the New York State defendants, two Buffalo police officers, the City of Buffalo, and Erie County, Docket Item 3 at ¶¶ 178-80, it is unclear which defendant or defendants allegedly falsified documents.  Nor is it clear exactly what the allegedly falsified documents are or what was false about them.  Harris may amend his complaint to explain what those falsified documents are and how those falsified documents might show that certain defendants might be liable for malicious prosecution.

amend his complaint to allege how the remaining New York State defendants could be liable for malicious prosecution here.  *See Cuoco*, 222 F.3d at 112.

### 3.    Unreasonable Seizure

Harris also brings a Fourth Amendment claim against the New York State defendants for "preventing free access to public areas."  Docket Item 3 at ¶¶ 185-88. The New York State defendants argue that this claim is not cognizable under the Fourth Amendment.  Docket Item 26-1 at 14.  For the reasons stated above, this Court construes that claim as an unreasonable seizure claim.  *See supra* at 13 n.10.  And for reasons similar to those outlined above, Harris has plausibly alleged that he was seized under the Fourth Amendment:  He says that he was forcibly "grabbed" and "shoved" while he was removed from the Erie County building lobby.  Docket Item 3 at ¶¶ 148-49. Absent any other argument about why Harris's unreasonable seizure claim is not viable, that claim may proceed against the New York State defendants.[23]

### 4.    Unreasonable Search of Harris and Seizure of Phone

Harris also says that after he was arrested, the New York State defendants unlawfully searched him and seized his phone.  Docket Item 3 at ¶¶ 189-93.  The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

---

[23] The Court recognizes that this claim shares many similarities with Harris's false arrest claim, especially because false arrest "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures."  *Weyant*, 101 F.3d at 852. But Harris may plead claims in the alternative, *see* Fed. R. Civ. P. 8(a), and he has alleged a viable false arrest claim for the reasons stated above.  So while those two claims ultimately may rise and fall together, they both may proceed at this time.

violated."  U.S. Const. amend. IV.  "When the police undertake a search 'to discover evidence of criminal wrongdoing, reasonableness generally requires the obtaining of a judicial warrant.'"  *United States v. Jones*, 43 F.4th 94, 108 (2d Cir. 2022) (quoting *Riley v. California*, 573 U.S. 373, 382 (2014)).  But "it [is] well accepted" that a "search incident to a lawful arrest" is "an exception to the warrant requirement."  *Riley*, 573 U.S. at 382.

Here, the New York State defendants say that Harris's unreasonable search and seizure claim challenging the seizure of his phone should be dismissed because he was searched incident to a lawful arrest.  But for the reasons stated above, this Court concludes that Harris has adequately alleged that he was not lawfully arrested.  For that reason, and because the New York State defendants offer no further argument other than the fact that he was purportedly searched incident to a valid arrest, Harris's unreasonable search and seizure claim challenging the seizure of his phone may proceed against the New York State defendants.  *See, e.g.*, *Josie v. City of New York*, 2023 WL 3765063, at *7 (E.D.N.Y. June 1, 2023) (denying motion to dismiss unreasonable search and seizure claim where the plaintiff "allege[d] that the defendants lacked probable cause for all three arrests . . . supporting a plausible inference that those searches were not performed incident to a lawful arrest").

### 5.    Unreasonable Search of Phone

Harris also brings two other unreasonable search and seizure claims against the New York State defendants, challenging the delay in obtaining a warrant for the search of his phone and the search of his phone.  Docket Item 3 at ¶¶ 194-204.  In some circumstances, "the Fourth Amendment allows the police to seize or secure [] property

without a warrant provided that they follow up by applying to a judge for a warrant to search the property's contents."  *United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020).  But "even a seizure based on probable cause is unconstitutional if police act with unreasonable delay in securing a warrant."  *Id.* (quoting *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998)).

Harris says that after he was arrested, his "phone was taken away from him without a warrant."  Docket Item 3 at ¶ 150.  And he says that Buffalo police officers Khalil and Wise then "received [Harris's] phone from [] McEvoy and Schrier through [the] chain of custody."  *Id.* at ¶ 153.  About forty days after the Buffalo police officers received the phone, Harris "asked w[here] the search warrant was" during an appearance in his case; in response, "the prosecutors stated to the Court that[] [they were] working on that."  *Id.*  "[S]ome time after" that, Khalil "su[b]mitted a warrant application for the phone and the footage within the phone."  *Id.*

So Harris says that after he was arrested, his phone was turned over to Buffalo police officers and that those officers waited about forty days before Khalil ultimately sought a warrant to search the phone.  Based on all that, it is unclear how any of the New York State defendants who first encountered Harris at the Erie County Building were personally involved in the allegedly unconstitutional delay in obtaining a search warrant and the resulting unconstitutional search of his phone.[24]  *See, e.g.*, *Dos Santos*

---

[24] Harris appears to argue that all New York State defendants are liable for the unconstitutional search because he was prosecuted for violating New York State law. *See* Docket Item 29 at 27-28.  But as noted above, the fact that an officer participated in an arrest does not necessarily make that officer liable for the resulting prosecution. *See Bermudez*, 790 F.3d at 377.  And as currently pleaded, Harris's amended complaint states a viable malicious prosecution claim only against McEvoy.

*v. Syracuse Police Dep't*, 2022 WL 16949542, at *4 (N.D.N.Y. Nov. 15, 2022) (finding unreasonable search claim inadequately pleaded where the plaintiff "name[d], as defendants, every officer who appear[ed] to have been involved in the search[] without pleading any facts indicating that the officers other than [one defendant] were personally involved in the alleged constitutional violations relating to the search"), *adopted*, 2023 WL 3612842 (N.D.N.Y. May 24, 2023).

For that reason, Harris's Fourth Amendment claims against the New York State defendants challenging the delay in obtaining a search warrant and the resulting search of his phone are subject to dismissal.  In light of his *pro se* status, however, Harris may amend his complaint to allege how the New York State defendants were personally involved in any unconstitutional search.  *See Cuoco*, 222 F.3d at 112.

### C.     Fourteenth Amendment

Like his claims against the Erie County defendants, Harris also refers to the Fourteenth Amendment in his claims against the New York State defendants.  Docket Item 3 at ¶¶ 175-204.  The New York State defendants have moved to dismiss any Fourteenth Amendment claims.  Docket Item 26-1 at 16-17.  Again, because it is not clear that Harris brings standalone Fourteenth Amendment claims, there are no such claims to dismiss.

### D.     Negligent Supervision

Finally, Harris brings a claim against Schumacher, McEvoy, and Perry for "supervisory negligent liability under *Monell*."  Docket Item 3 at ¶¶ 205-07 (italicization added).  But *Monell* applies to local governments only; it does not extend to the states. *See, e.g.*, *Quern v. Jordan*, 440 U.S. 332, 338 (1979) ("This Court's holding in *Monell*

was 'limited to local government units which are not considered part of the State for Eleventh Amendment purposes' . . . ." (quoting *Monell*, 436 U.S. at 690 n.54)). And negligent supervision is not sufficient to establish an individual supervisor's liability for an underlying constitutional violation. *See, e.g.*, *Tangreti*, 983 F.3d at 620 ("[I]t is not enough for [a plaintiff] to show that [a defendant] was negligent, or even grossly negligent, in [the defendant's] supervision of the" lower-level "officers or in failing to act on the information [the defendant] had."); *Braxton v. Bruen*, 2021 WL 4950257, at \*5 n.8 (N.D.N.Y. Oct. 25, 2021) ("Although negligent supervision was one of the ways [to] establish[] personal involvement in a constitutional violation under [section] 1983, after *Tangreti*, [a p]laintiff must prove that the individual [d]efendants themselves" committed the constitutional violation.). For those reasons, Harris's "supervisory negligent liability" claim is dismissed without leave to amend. *See Cuoco*, 222 F.3d at 112.

### CONCLUSION

For the reasons stated above, the Erie County defendants' motion to dismiss, Docket Item 9, and the New York State defendants' motion to dismiss, Docket Item 26, are GRANTED in part and DENIED in part. Harris's Fourth Amendment excessive force and unreasonable seizure claims against Bishop; his "supervisory negligent liability under *Monell*" claim against Schumacher, McEvoy, and Perry; and any official-capacity claims against the New York State defendants are dismissed. The following claims may proceed: (1) Harris's First Amendment claim against Alabanese, Bishop, Roetzer, and Wahl; (2) his Fourth Amendment unreasonable seizure claim against Alabanese, Roetzer, and Wahl; (3) his Fourth Amendment excessive force claim against Alabanese, Roetzer, and Wahl; (4) his First Amendment claim against the New York

State defendants; (5) his false arrest claim against the New York State defendants; (6) his Fourth Amendment unreasonable seizure claim against the New York State defendants; (7) his malicious prosecution claim against McEvoy; and (8) his Fourth Amendment unreasonable search and seizure claim against the New York State defendants related to the seizure of his phone.  Harris's remaining claims against the Erie County defendants and the New York State defendants are subject to dismissal, but he may amend his complaint within 45 days of the date of this order to correct the deficiencies noted above.

If Harris does not amend his complaint within 45 days of the date of this order, those remaining claims against the Erie County defendants and the New York State defendants will be dismissed without further order, and the Clerk of the Court shall terminate Erie County as a defendant.  No later than 30 days after any second amended complaint is filed, the Erie County defendants and New York State defendants may answer, move against, or otherwise respond to the second amended complaint.  If Harris does not amend his complaint within 45 days of the date of this order, the remaining Erie County defendants and the New York State defendants shall answer the amended complaint within 60 days of the date of this order.


SO ORDERED.

Dated:   September 8, 2023
         Buffalo, New York


                                      /s/ Lawrence J. Vilardo
                                      LAWRENCE J. VILARDO
                                      UNITED STATES DISTRICT JUDGE